**In re Leslie P. KRAFT, Debtor.**

**Leslie P. KRAFT, Plaintiff,**

**v.**

**NEW YORK STATE HIGHER ED-
UCATION SERVICES CORPO-
RATION, Defendant.**

Bankruptcy No. 92–13001 K.
Adv. No. 92–1362 K.

United States Bankruptcy Court,
W.D. New York.

Sept. 21, 1993.

Deborah A. Olszowka, Niagara County Legal Aid Soc., Inc., Niagara Falls, NY, for plaintiff.

Barry S. Weinstein, Office of Counsel, New York State Higher Educ. Services Corp., Albany, NY, for defendant.

MICHAEL J. KAPLAN, Chief Judge.

In this Adversary Proceeding, the Debtor, Leslie P. Kraft, seeks judgment discharging her student loans on the basis of undue hardship under 11 U.S.C. § 523(a)(8). After trial, the Court denies the judgment she seeks,[1] for as discussed herein, she has

1. The Debtor has filed but withdrawn (without prejudice) a "Motion to Reopen Trial Upon Discovery of New Evidence and Upon Change of Circumstances." The Court would note in this regard that the basis of that motion (the Debtor now claims that she was pregnant at trial, but was not aware of that fact, and that in the weeks since trial she has also learned that two of her

children might rejoin her) demonstrates the problematic nature of the statute at hand, a statute which commands that the Court predict the future. A Court might rule at trial in any given case that repaying the student loan debts would not constitute an "undue hardship," only to be proven unequivocally wrong a month later when the Debtor becomes unexpectedly injured, ill,

sought discharge of this debt too soon after bankruptcy discharge to establish "good faith."

The facts, as they existed at the time of trial, were these:

The Debtor is a divorced female, 38 years of age. She has three children, ages 19, 17 and 16, all of whom live not with her, but with grandparents or great grandparents on their father's side. While she does not contribute to their support, she does give money to the children when she can.

She receives no public assistance and nothing from her former husband. Her parents loan her some money, such as $1,000 loaned to her in March of 1993 to buy a car. (She has not repaid that loan as of yet.) She lives in an apartment alone. (Her brother had lived with her for a while.) She pays $200 per month in rent plus $25 per month in repairs to the apartment. She pays utilities totalling $140 to $190 per month. She spends only $25 per week on food. Her car insurance is $700–800 per year. Gasoline for the car is $90 per month. Laundry expense is $15 to $20 per week. She budgets nothing for clothing. She has no health insurance and budgets nothing for health care although she has been told she needs physical therapy and shots or surgery for a back injury received in a car accident in January of 1991.

Her only apparent "vice" for budgetary purposes is cigarettes, which she buys on an Indian Reservation in order to obtain them at lesser cost ($36.00 per month). Her only entertainment is cable television (including HBO) at $44 per month. She also spends $4 per week for bottled water; she claims that the plumbing in her apartment is cast iron which imparts a strange taste to the water and has made her ill.

The amount owed on her student loans was $18,463.51 in principal plus $486.21 interest as of January of this year. Monthly payments on this amount would be $228.

She is employed 38 to 40 hours per week driving a school bus, at $6.36 per hour. She is paid weekly and nets between $175 and $203 per week including overtime. Only taxes are deducted. She started driving a school bus on November 22, 1991. During eight or nine weeks of the calendar year there is no work for a school bus driver, and she receives unemployment compensation of $23.50 per day during that period.

Her personal car is a 1986 Dodge Caravan purchased for $2750 in March 1993 using the $1,000 she borrowed from her parents as well as tax refund proceeds and proceeds from the sale of the marital residence.

She filed her bankruptcy petition on August 28, 1992. Since then she has incurred no new debts, but is behind on her utility payments because of weeks that there was no work (Christmas vacation, Easter vacation, etc.).

She had been married for sixteen years. Her divorce became final in 1989 or 1990. During her marriage her only employment had been at fast food restaurants and also giving Tupperware parties. These were minimum wage positions.

After she was separated she worked days and went to school nights. She had jobs as a housekeeper at a hotel and as a cab driver.

She attended Bryant and Stratton by virtue of the loans in question, enrolling in an eighteen-month course on travel and tourism management, which course, however, took her two and one-half years to complete. It was completed in 1991. While in school she had an internship with a travel agency, but did not receive permanent employment there; she was told that she would need three years of experience. Within a month

disabled, or pregnant or unemployed. Conversely, the Court might rule that the repayment *would* be an undue hardship, but the debtor might soon thereafter enjoy a windfall. The statute is in need of revision. Ideally, it would direct that student loans be repaid "to the extent that" repayment would not constitute an undue hardship, so that suitable terms for part payment could be imposed (if not agreed upon) and could make provision for changed circumstances. In

light of changes like those claimed by the Debtor here, the current statute might require exploration of a Debtor's most personal and private attitudes and beliefs and practices, in order to determine whether an inability to pay "is likely to continue" for the requisite period of time. The parties must approach settlement discussions in these matters with an enlightened attitude.

of her graduation she sent out dozens of resumes and letters, requesting an opportunity for an entry level position in travel and tourism management. She sought positions as a ticket agent for airlines, work as a travel agent with agencies, and work with hotels. She watched the newspaper ads, and found that most positions with travel agencies advertising in the newspaper wanted three to five years experience and experience as well on the "Apollo" or "Sabre" computer system rather than the "System One" computer she had learned at school.

She did receive an offer from the American Automobile Association (AAA), but not in the travel agency division. She was offered a position to dispatch tow trucks at $5.00 per hour.

She traveled to Atlanta and to Florida. She spoke to travel agencies and hotels and was told that the industry was suffering hard times and that there were no positions available. She went to work for Gray Lines Sightseeing Tours as a tour bus operator working six hour shifts at $4.75 an hour. The work was a part-time summer position only.

She accepted the position as a school bus driver because of the higher pay ($6.36/hr), regular hours, and nearly year-round employment.

She continues to work towards obtaining a better job in travel and tourism. She works with the Bryant and Stratton Placement Office. She was last there in the month before trial, and communicates with them by telephone frequently.

There is no prospect of promotions or raises with the bus company for which she drives. (Importantly, there is no evidence of job prospects other than in travel, tourism, or school bus driving.)

Sixty-eight percent of her scheduled debt is student loan debt. From 1989 to 1991 she made at least nine payments on her student loans (a total of $1016.27) and received two deferments. As noted above, the scheduled monthly payment on the balance is $228.00.

ANALYSIS

The case governing the matter of "undue hardship" under 11 U.S.C. § 523(a)(8) in this Circuit is *Brunner v. New York State Higher Education Services Corporation*, 831 F.2d 395 (2d Cir.1987). The Circuit therein adopted a three-prong test by which a Debtor seeking to discharge an education loan must show:

1. That the Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself (and any dependents) if forced to repay the loans;

2. That additional, exceptional circumstances exist, strongly suggestive of continuing inability to repay over an extended period of time, or indicating a likelihood that her current inability will extend for a significant portion of the loan repayment period; and

3. That the Debtor has made good faith efforts to repay the loans.

In adopting this three-prong test, the Circuit stated that it was doing so "for the reasons set forth in the District Court's Order." It is appropriate, then, to examine the opinion of the learned District Court when interpreting the scope of the Circuit's decision in the *Brunner* case.

In the case of *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985) the District Court enunciated the three-prong test later adopted by the Circuit. The Court stated that it drew this test together from a number of tests used by other Courts or in other jurisdictions. First citing one Court that wrote that "dischargeability of student loans should be based upon the certainty of hopelessness,[2] not simply a present inability to fulfill financial commitment," the District Court stated that this prong of the test has been formulated as the necessity of showing "unique" or "exceptional" circumstances. It stated that "such circumstances have been found most frequently as a result of illness, *a lack of useable job skills*, the existence of a large number of dependents, or a combination of these." [Citations omitted. Emphasis added.] The

2. With all respect to the Court which initially used this unfortunate phrase, the present Court thinks the standard excessive. (It is hard to believe that persons with a "certainty of hopelessness" are not afflicted with too much despair to file a bankruptcy petition.)

Court's reference to "a lack of usable job skills" included the example of a case in which the Debtor had not completed a high school education and could not be expected ever to obtain income sufficient to pay the student loans in question.

But in addressing both the "good faith" prong and what the Court called the showing of "circumstances beyond the control of the debtor," the District Court roundly criticized Courts which considered the "value" of the education that had been paid for by the government-guaranteed loans. The Court expressed strong disapproval of the notion that dischargeability of student loans should turn upon the wisdom of the Debtor's choice of curriculum.[3]

 In interpreting the District Court's concern for Debtors who "lack ... usable job skills" but its disapproval of a Debtor's complaint that "there are no jobs available in [his or her] field of study," the present Court concludes that the *Brunner* test does not permit a Debtor to work at less than a fully productive level while "holding out" for a job in the Debtor's chosen field, and it does not permit discharge of a student loan on the basis that the Debtor made a poor career choice (or was misled) in selecting the curriculum that the loan financed. However, the Court is permitted to consider the extent of the Debtor's usable job skills, and the extent of the Debtor's use of those skills, whether the skills were derived from the education paid for by loan or not.[4]

A wide variety of scenarios seems possible. For example,

1. Consider a Debtor who pursued a high-cost education with potential for high income (e.g. law school), and

a. The Debtor completed the education and found a job (whether within or without that field), but at much lower income than anticipated.

b. The Debtor completed the education only to find no jobs available in that field except at very low income, and accepted that employment, ignoring higher income potential in a different field.

c. The Debtor did not complete the education but is productively employed at too low an income level to repay the loans.

2. Consider a Debtor who pursued a high-cost education with only modest income potential (e.g., a graduate degree in elementary education), and

a. Debtor completed the education and accepted a job in the field, but income is insufficient to repay the cost of the education, while higher income is available outside the field.

b. Debtor did or did not complete the education and is unable to obtain meaningful work.

3. Consider a Debtor who pursued (and either did or did not complete) an education which could prove to be of little present or anticipated value in the locale and in the era (e.g. tractor-trailer driving, cosmetology, medical assistant, travel and tourism management)[5] and is employed either in that field or outside it at too low a level to repay the debt.

Of course other scenarios are also possible.

Examination of the District and Circuit Court decisions in *Brunner* lead to general conclusions regarding only two of the six scenarios above. Since those decisions command that a Debtor who completed an education in a low-paying field may not be heard

3. E.g., see *Matter of Powelson,* 25 B.R. 274 (Bankr.D.Neb.1982) and *In re Carter,* 29 B.R. 228 (Bankr.N.D.Ohio 1983). The present Court would note that sometimes the curriculum was misrepresented or oversold to the Debtor by a "for-profit" educational institution. Moreover, it is the educational institution (which sometimes has an interest in "hype-ing" the earning power of its curriculum) that disburses the loan proceeds, not the lender or the government insurer, and advises the Debtor regarding what living expenses "should" be borrowed as "education"

expenses. In the case of the present Debtor, car payments were part of the "student loan."

4. As noted above, the District Court in *Brunner* cited *In re Siebert,* 10 B.R. 704 (Bankr.S.D.Ohio 1981) as an example of "hardship"; there continuing inability was based solely on the debtor's lack of skills and 8th grade education.

5. These are fine occupations, but can offer limited opportunities in times of high unemployment.

to complain on that basis alone that the field is too low-paying to permit repayment of the debts. The Debtors in scenarios 1–b and 2–a might not obtain relief. On the other hand, if the Debtor's usable job skills (whether obtained through the government-financed educational process or not) would not provide the Debtor sufficient income to repay the debts, and if that condition could expect to exist through a significant portion of the repayment period, then the *Brunner* test would not preclude discharge of the obligations. This is the realm of the other posited scenarios.

The present Court has upheld a different Debtor's claim of "undue hardship" in a case in which she was living at a subsistence level and had made a good faith effort to repay the loans, but had derived no usable job skills from her uncompleted higher education (she sought to become an accountant or even a bookkeeper) or from any other source or from natural skills, and had a long history (more than 5 years) of long hours at minimum wage jobs and no expectation whatsoever of sufficient improvement even in the long-term future, to permit repayment of the loans.

The Court must ignore the fact that the Debtor at Bar chose or was enticed into a field—travel and tourism management—which is neither high-paying nor rife with opportunity in this locale in these economic times. The Court finds that the Debtor has made a diligent and conscientious effort to obtain the best employment she can, *inside* her field, and it seems to offer no current prospects. But she has only been out of school for a year and one-half, is not working particularly long hours, and has not made an extensive search for work outside her field. In these regards the issues of "good faith" and "exceptional circumstances" become confounded.

This Court knows not what the future is likely to hold for Ms. Kraft (the second prong of the *Brunner* test), but it holds that her 11 U.S.C. § 523(a)(8) complaint was filed too soon. She cannot demonstrate "good faith."

There is no limitations period for the filing of Complaints under 11 U.S.C. § 523(a)(8),[6] whether filed by the Debtor or the Creditor. Asking the Court to make the § 523(a)(8) determination might be a "one-shot" opportunity. (Although that issue might later be placed before the Court as noted in footnote 1, above.) Once the automatic stay against "property of the debtor" terminates (which, according to 11 U.S.C. § 362(c), occurs upon entry of discharge), an entity such as the New York State Higher Education Services Corporation is free to resume collection efforts. The Debtor, discharged from other debts, may determine the point in time at which the "snapshot" is to be taken—the point in time at which her present condition, past efforts and future prospects are to be evaluated.

The statute speaks not merely of "hardship," but of "undue hardship," and the Circuit has directed inquiry as much into the Debtor's "past" efforts ("good faith") at the time of the snapshot, as into her present condition (the first prong) and future prospects (the second prong). Given an interpretation of "undue" hardship that commands, essentially, a "worthiness" inquiry, it behooves the Debtor to select the snapshot date wisely.

Here we have a Debtor who is fortunate in that despite a non-debilitating back infirmity, she apparently enjoys good health. She has no dependents. Her job search, though diligent, has been restricted to the travel and tourism industry. *Brunner* teaches that that is not sufficient. At this point it is by no means clear that she could not improve her income, though perhaps not in her chosen field and perhaps not in a 38–hour week as a driver of a school bus. Now that other debts are discharged, it is possible to devote any improvement exclusively to her student loan.

In this case, it appears that the Debtor has sought discharge of the student loan too soon—before she gave "life after discharge" a fair chance and before she gave opportuni-

6. Complaints under 11 U.S.C. § 523(a)(2), (4), or (6) must be filed by the creditor within 60 days after the first date set for the first meeting of creditors. 11 U.S.C. § 523(c), Bankr.Rule 4007(c).

ties inside and outside the travel and tourism industry a fair chance.

This is not a case of a Debtor with a long job history of minimum wage employment after successfully completing her curriculum and who has demonstrated no prospects for future improvements despite substantial efforts.

Judgment shall be entered in favor of New York State Higher Education Services Corporation declaring the debt not-discharged. New York State Higher Education Services Corporation may submit an affidavit of amount due, if it wishes entry of money judgment.

SO ORDERED.